**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Merrill Corporation,
a Minnesota corporation; and
Merrill Communications LLC,
a Delaware limited liability company,

                Plaintiffs,

   v.

R.R. Donnelley & Sons Company,
a Delaware corporation; Peter Day;
Stephanie Madigan; and
Robert Stensby,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-4738 ADM/JSM

_____

William Z. Pentelovitch, Esq., and Alain M. Baudry, Esq., Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, on behalf of Plaintiffs.

John G. Hutchinson, Esq., Sidley Austin LLP, New York, NY, and Thomas J. Conley, Esq., Leonard, Street & Deinard, Minneapolis, MN, on behalf of Defendants.

_____

**I. INTRODUCTION**

On July 25, 2008, the undersigned United States District Judge heard oral argument on Plaintiffs Merrill Corporation and Merrill Communications LLC's (collectively "Merrill") Motion for Temporary Injunctive Relief [Docket No. 1, attach. 8, Ex. E, Docket No. 9]. Plaintiffs' Motion for a temporary restraining order is granted in part and denied in part. Magistrate Judge Janie S. Mayeron will conduct a scheduling conference to address future discovery and further court proceedings and to create a list of clients protected by the Noncompete Agreements.

## II.  BACKGROUND

Merrill contracts with businesses to provide outsourcing solutions for complex business communications and to address information management needs.  Verified Compl. [Docket No. 1, attach. 1] ¶ 7.  In addition to Merrill, Defendant R.R. Donnelley & Sons Company ("R.R. Donnelley") is one of two other principal competitors in the transactional communications business in the Chicago area.

On July 18, 2008, Merrill commenced this action to temporarily restrain and enjoin Defendants Peter Day ("Day"), Stephanie Madigan ("Madigan"), and Robert Stensby ("Stensby") (collectively the "individual defendants") from violating their Noncompete and Confidentiality Provisions ("Noncompete Agreements") with Merrill.  In 2000, Merrill hired Madigan, and Stensby as sales representatives and Day as a selling sales director.  Madigan Aff. [Docket No. 15] ¶ 1; Stensby Decl. [Docket No. 17] ¶ 1; Day Aff. [Docket No. 16] ¶ 1.  Madigan, Stensby, and Day all agreed to the following provision:

> You acknowledge that for one year following the termination of your employment, Merrill is entitled to protection from the use or disclosure of the client relationships for the benefit of a third party or for your own benefit.  You therefore agree that for one year following the termination of your employment, you will not directly or indirectly call upon, solicit, or provide any service or product to any existing or potential Merrill client serviced by, assigned to, or solicited by you working alone or in conjunction with another Merrill employee.  These restrictions apply only where the client is solicited to purchase a service or product that competes with a service or product of Merrill.

Verified Compl. [Docket No. 1, attachs. 3-4, Exs. F ("Day Noncompete"), G ("Madigan Noncompete"), H ("Stensby Noncompete")].

On May 31, 2008, Madigan, Stensby, and Day terminated their employment with Merrill to begin working for R.R. Donnelley on June 1, 2008.  Madigan Aff. ¶ 1; Stensby Decl. ¶ 1; Day

2

Aff. ¶ 1. Since leaving Merrill, Stensby and Day had contact with Merrill customers, which Merrill contends was in violation of the Noncompete Agreements. While employed by Merrill, Stensby was the primary sales representative assigned to the law firm of McDermott Will & Emery ("McDermott"). Rossi Aff. [Docket No. 32] ¶ 5. Stensby had worked with McDermott before joining Merrill. Stensby Decl. ¶ 4. Among the services Stensby provided McDermott, he arranged an annual event for McDermott's summer associates referred to as the "day at the printer" event. Rossi Aff. ¶ 6. After joining R.R. Donnelley, Stensby received a call from John Tamasiea ("Tamasiea"), a partner at McDermott with whom Stensby worked to coordinate the "day at the printer" event while at Merrill. Stensby Decl. ¶ 3. Tamasiea contacted Stensby to ask if R.R. Donnelley would host the "day at the printer" event that year. Id. Stensby told Tamasiea that he could not work with McDermott but that he would have someone from R.R. Donnelley contact the McDermott coordinator for the event. Id. Mark Rossi ("Rossi"), who had supervised Madigan, Stensby, and Day at Merrill, subsequently learned about Stensby's contact with McDermott and that R.R. Donnelley would replace Merrill for the "day at the printer" event. Rossi Aff. ¶ 7.

Rossi later learned that Day had also been in contact with a Merrill client after beginning his employment with R.R. Donnelley. Id. ¶ 8. On approximately July 11, 2008, Rossi checked Day's voice mail box at Merrill, which had not yet been disconnected, and listened to a message left by Merrill client GTCR's vice president. Id. According to Rossi, the individual who left the message stated that he was responding to an email he received regarding a business matter. Id. Day admits that after leaving Merrill he contacted Aaron Cohen ("Cohen"), who is a vice president at GTCR, by email on July 10, 2008, to offer Cohen his personal Cubs tickets for the

game on July 11, 2008.  Day Aff. ¶ 3.  Day had in the past provided Cohen with Cubs tickets paid for by Merrill.  Rossi Decl. [Docket No. 21] Ex. 1 (Day expense report reflecting a $323.60 charge on May 18, 2008, for Cubs tickets for Cohen with the following stated purpose: "Continue business relationship").

Based on Stensby's contact with McDermott and Day's contact with GTCR, Merrill contends that a temporary injunction is necessary to restrain Madigan, Stensby, and Day from violating their Noncompete Agreements.  Merrill also alleges a claim of tortious intereference with contract against R.R. Donnelley and seeks injunctive relief against the company as well.  Merrill contends that an injunction is necessary to restrain R.R. Donnelley from permitting that Madigan, Stensby, and Day violate the Noncompete Agreements on R.R. Donnelley's behalf.

### III.  DISCUSSION

**A.     Interpretation of the Noncompete Agreements**

The parties do not contest the existence or enforceability of the Noncompete Agreements between Merrill and the individual defendants but dispute the scope of the Noncompete Agreements.  Accordingly, resolution of this Motion centers on interpretation of the Noncompete Agreements.  Merrill contends"[n]etworking at tradeshows, conferences, and seminars, and sending out invitations to social events or gifts are active forms of solicitation for purposes of the Agreement, since these efforts constitute efforts to build company goodwill and customer relationships." Pl.'s Mem. in Supp. of Mot. for TRO [Docket No. 1, attach. 9] at 15.  Defendants assert that there is no support for the proposition that networking at tradeshows, conferences, and seminars and sending invitations to events or gifts to clients constitutes solicitation.  Defendants contend that the Noncompete Agreements define solicitation more narrowly and only prohibit

solicitation to purchase a service or product that competes with one of Merrill's services or products.

The Court interprets "solicitation" more narrowly than Merrill argues but more broadly than Defendants suggest. To prohibit the individual defendants from networking at tradeshows, conferences, and seminars is unreasonable and is not supported by the plain language of the Noncompete Agreements. While the individual defendants are prohibited from soliciting Merrill clients (to purchase a service or product that competes with a Merrill service or product) in any setting, including a tradeshow or conference, to prohibit them from any networking at such events is excessive.

However, contacting existing Merrill clients and offering to provide services typically provided by Merrill to build and enhance client relationships does fall within the scope of the Noncompete Agreements. Defendants rely on the following sentence in the Noncompete Agreement to support their position that a client contact is only prohibited where it includes a direct solicitation to purchase a product or service: "These restrictions apply only where the client is solicited to purchase a service or product that competes with a service or product of Merrill." However, Merrill's practice, which was employed by the individual defendants while working for Merrill, was to provide clients with gifts and free services as part of ongoing efforts to enhance client relationships and business development. See Rossi Decl. ¶¶ 2-4. And while each contact likely did not include a direct and explicit solicitation to purchase a product or service, each contact was certainly done with that objective in mind and can fairly be characterized as part of an effort to solicit Merrill clients to purchase services or products.

Merrill also asserts that the individual defendants are prohibited from contacting Merrill clients with whom the individual defendants worked prior to joining Merrill in 2000. Defendants counter that clients brought by the individual defendants to Merrill are beyond the scope of the Noncompete Agreements. The Noncompete Agreements prohibit the individual defendants from soliciting "existing or potential Merrill client[s]" and make no exception for pre-existing clients brought to Merrill by the individual defendants. Once the individual defendants began working for Merrill and once their pre-existing clients became clients of Merrill, those clients became "existing" Merrill clients and are protected by the Noncompete Agreements.

Finally, Merrill contends that for the purposes of the Noncompete Agreements, the term "client" includes "both individual and company clients, since Merrill's employees cultivate relationships and goodwill with both the individual client contact as well as the company where the individual is employed." Pl.'s Mem. in Supp. of Mot. for TRO at 15. Defendants argue that the term "client" is limited to companies and does not include the individuals who work for those companies. "A contract is ambiguous when its language is reasonably susceptible to more than one interpretation." Ecolab, Inc. v. Gartland, 537 N.W.2d 291, 295 (Minn. Ct. App. 1995) (citing Current Tech. Concepts v. Irie Enter., 530 N.W.2d 539, 543 (Minn. 1995)). Because both of the definitions offered by the parties could be applied to the Noncompete Agreements, the term "client" is ambiguous. "[W]here a contract is open to two interpretations, the one more favorable to the party who did not draft the instrument should be adopted in the absence of a clear showing that a contrary meaning was intended by the parties at the time of its execution." Wick v. Murphy, 54 N.W.2d 805, 809 (Minn. 1952). Merrill has failed to offer any evidence of

its or the Defendants' intentions. Accordingly, the Court interprets the term "client" according to the Defendants' interpretation—that is, as being limited to the actual company client and not the individuals who work for the company. As such, individuals who worked for a Merrill company client are not protected by the Noncompete Agreements once they terminate their employment with that client.

**B.     Temporary Injunctive Relief**

The procedures for seeking injunctive relief are set forth in Rule 65 of the Federal Rules of Civil Procedure. The Eighth Circuit in Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 113-14 (8th Cir. 1981) set forth four factors that should be considered in determining whether to grant injunctive relief: (1) the threat of irreparable harm to the moving party if an injunction is not granted; (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted; (3) the probability that the moving party will succeed on the merits; and (4) the public interest. The record establishes that Merrill has satisfied all of the Dataphase elements with regard to Stensby and Day, but not with regard to Madigan and R.R. Donnelley.

First, as to Madigan, there is no evidence that Madigan breached the Noncompete Agreement or engaged in any conduct that demonstrates a threat of irreparable harm to Merrill. Nor is there any evidence indicating that Merrill is likely to succeed in a breach of contract claim against Madigan. Accordingly, Merrill's Motion for Temporary Injunctive Relief to restrain Madigan is denied. With regard to Merrill's claim that R.R. Donnelley tortiously interfered with its contracts with the individual defendants and its motion for temporary injunctive relief to restrain R.R. Donnelley, Merrill has similarly failed to set forth evidence demonstrating the

threat of irreparable harm or a likelihood of success on the merits. A tortious interference with contractual relationship claim requires proof of: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." Furley Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982). No evidence has been proffered that R.R. Donnelley intentionally procured the breach of the Noncompete Agreements. To the contrary, R.R. Donnelley made clear to the individual defendants that it would not permit them to violate their contractual duties to Merrill. Conley Aff. [Docket No. 14] Ex. 7. Accordingly, Merrill's Motion for Temporary Injunctive Relief to restrain R.R. Donnelley is denied.

There is evidence that Stensby and Day, however, breached their Noncompete Agreements with Merrill in their contacts with McDermott and GTCR. Stensby's contact, although initiated by McDermott, breached the Noncompete Agreement because he directed someone at R.R. Donnelley to contact McDermott to provide McDermott with a service previously provided by Merrill. Accordingly, Stensby's conduct constituted an indirect solicitation of an existing Merrill client. Day directly solicited GTCR when he contacted Cohen and offered to provide him with Cubs tickets as he had previously done while working for Merrill. The evidence of Stensby and Day's breach causes the first Dataphase factor to weigh in favor of Merrill. Irreparable harm is inferred from the breach of a valid and enforceable restrictive covenant. See Alside, Inc. v. Larson, 220 N.W.3d 274, 278 (Minn. 1974) (affirming the trial court's ruling that because defendants breached the restrictive covenant, they must be restrained in order to avoid irreparable harm). The second Dataphase factor, the balancing of the harms, also weighs in favor of granting Merrill's Motion because while granting Merrill

injunctive relief causes slight harm to Stensby and Day, denying injunctive relief to Merrill could expose it to further breach of the covenants Stensby and Day accepted. Merrill has also demonstrated a likelihood of success on the merits and thus the third factor weighs in its favor. Because the Noncompete Agreements are enforceable (the restrictions are reasonable and the parties do not dispute that they were supported by consideration nor that Merrill has a legitimate interest in restraining competition by the individual defendants), and because Merrill has strong evidence that Stensby and Day have violated their Noncompete Agreements, Merrill is likely to succeed in a breach of contract claim against Stensby and Day. Finally, the fourth factor weighs in Merrill's favor because public policy favors enforcing valid noncompete agreements. N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984) (stating "we find no merit in defendants' argument that the public interest weighs in their favor. To the contrary, if these noncompete agreements are valid, the public interest calls for their enforcement.").

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs Merrill Corporation and Merrill Communications LLC's Motion for Temporary Injunctive Relief [Docket No. 1, attach. 8, Ex. E, Docket No. 9] is **GRANTED** to restrain Defendants Robert Stensby and Peter Day;

2. Plaintiffs' Motion to restrain Defendants R.R. Donnelley & Sons Company and Stephanie Madigan is **DENIED**; and

3. The parties are ordered to meet with Magistrate Judge Janie S. Mayeron for a scheduling conference on Thursday, August 7, 2008, at 1:30 pm in courtroom four of the St. Paul Courthouse, to address future discovery and further court proceedings and to create a list of clients protected by the Noncompete Agreements.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 1, 2008.